*United States v. Lewis*

# United States Court of Appeals
## For the Second Circuit

---

August Term 2022

Argued: October 28, 2022
Decided: March 21, 2023

No. 21-838

---

UNITED STATES OF AMERICA,

*Appellee*,

*v.*

VASHUN LEWIS, AKA V-LOVE,

*Defendant-Appellant*.

---

Appeal from the United States District Court
for the District of Connecticut
No. 18-cr-220, Janet C. Hall, *Judge*.

---

Before:     LOHIER, CARNEY, and NATHAN, *Circuit Judge*s.

Defendant-Appellant Vashun Lewis was found guilty of gun possession in furtherance of drug trafficking under 18 U.S.C. § 924(c)(1)(A)(i), and being a felon in possession of a firearm under 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  Lewis now appeals, arguing that evidence regarding a firearm and marijuana should have been suppressed because the warrant pursuant to which the search of his second-floor apartment in a triplex was conducted did not authorize a search of the shared

back porch where this evidence was found.  He also challenges the sufficiency of the government's evidence of his possession in furtherance of drug trafficking, and the application of a sentencing enhancement for obstruction of justice.  As to all issues, we **AFFIRM**.

————

JOCELYN COURTNEY KAOUTZANIS (Sandra S. Glover, *on the brief*) *for* Vanessa Roberts Avery, United States Attorney for the District of Connecticut, New Haven, CT, *for Appellee*.

BRIAN SPEARS, Spears Manning & Martini LLC, Southport, CT, *for Defendant-Appellant*.

————

NATHAN, *Circuit Judge*:

Defendant-Appellant Vashun Lewis was convicted by a jury of one count of possession of a firearm in furtherance of marijuana trafficking and one count of possession of a firearm by a convicted felon.  On appeal, Lewis challenges the district court's denial of his motion to suppress the firearm and marijuana, which were found during a search of the ground-floor back porch of the triplex where he lived.  Lewis also challenges the sufficiency of the evidence of his possession of a firearm in furtherance of drug trafficking.  He further contends that the district court erred in applying a two-point enhancement in the guidelines calculation for

obstruction of justice based on Lewis's statements in an affidavit in support of his motion to suppress.

As to the suppression issue, although we reject any categorical rule that the Fourth Amendment always allows warrantless searches of all shared areas in multi-unit buildings, we affirm the district court's denial of Lewis's motion because Lewis failed to carry his burden to show that his Fourth Amendment rights extended to the shared back porch of the triplex where he lived. Because we also conclude the evidence was sufficient to convict him of possession of a firearm in furtherance of marijuana trafficking, and the application of the obstruction enhancement was appropriate, we affirm the judgment of the district court.

## BACKGROUND

### I.    Pre-Trial

In the spring of 2017, the New Haven Police Department was investigating Lewis because it suspected he was engaged in a large-scale, illegal cigarette trafficking enterprise. On May 30, 2017, the New Haven Police secured a search warrant based on a confidential informant's statement that the informant had recently seen large quantities of cigarettes, heroin, and marijuana in Lewis's

bedroom located in a second-floor apartment at 200 Winthrop Avenue in New Haven. The statement also indicated that the informant saw Lewis in possession of a .40 caliber handgun while in the apartment and in the basement of 200 Winthrop Avenue.

The warrant authorized a search at 200 Winthrop, which it described as "a three-family house" in which "[t]he front entrance doors lead to a common entrance with two interior apartment doors. . . . Inside the left door there is a staircase that leads into the 2nd floor apartment and the 3rd floor which are separate." App. at 91. The warrant stated that "[t]he 2nd floor apartment, as well as the basement, is the target location." *Id.* The New Haven Police executed the search warrant and seized—in addition to several cartons of cigarettes, marijuana, and drug paraphernalia—a 9mm handgun. The handgun, however, was found neither in the apartment nor in the basement. Instead, police found it, along with more marijuana, inside a sock in a laundry basket located on the small back porch (or landing area) off the ground-floor rear door of the three-story building. That rear back door of the building opened into a common stairwell that led up to the second- and third-floor apartments.

4

Based on this evidence, in state court, Lewis was charged with, and pled guilty to, possession of and intent to distribute the marijuana found on the porch. Lewis was then charged in a two-count federal indictment with gun possession in furtherance of drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i), and being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

In the district court, Lewis filed a motion to suppress, challenging the warrant and search on various grounds. As relevant to this appeal, he argued that the search of the back porch was illegal because it was "beyond the scope of the description of the place to be searched in the search warrant." D. Conn. No. 18-cr-220 doc. 51 at 8. The Government responded that Lewis was not entitled to Fourth Amendment protection over the items on the back porch because he had no expectation of privacy in a common area in a multi-unit building.

At a hearing on the motion, Lewis's counsel reiterated his argument regarding the scope of the warrant but did not meaningfully address the Government's argument regarding Lewis's lack of Fourth Amendment interest in the porch. Lewis conceded that the porch where the search took place was a shared area of the triplex with a door that "enters into a nonapartment portion of

the house" in which a hallway leads to both the first- and second-floor apartments. App. at 140. Moreover, Lewis failed to proffer or point to any evidence that he had a protected Fourth Amendment interest in the porch. Based on Lewis's concessions and his failure to rebut the Government's argument, the court denied Lewis's motion as to the search of the back porch, concluding he "does not have standing to suppress any evidence found in the area." App. at 145. In its oral ruling, the district court noted both that the defendant bears the burden of proving he has a legitimate expectation of privacy in the area intruded upon and that "[i]t is well-settled in the Second Circuit that because an individual has no power to exclude another from a common area, a defendant has no legitimate expectation of privacy in [] 'a common area that's accessible to the other tenants in [a] multifamily apartment building.'" App. at 143–44 (quoting *United States v. Jones*, 893 F.3d 66, 72 (2d Cir. 2018)).

## II. Trial

A bifurcated trial was held, in which a separate phase for Count One (the felon in possession count) followed the verdict on Count Two (the possession in furtherance of drug trafficking count). During the first phase of the trial, New Haven Police Detective Mark DeCarvalho testified that he executed a search

6

warrant of Lewis's second-floor apartment on June 1, 2017, and found Lewis there with a woman (Lewis's girlfriend) and her juvenile daughter. Detective DeCarvalho testified that the police found marijuana, about $1,300 in small bundles of cash, plastic Ziploc bags with an apple-shaped logo, and smaller bags with marijuana residue on them. He also testified that the officers found the laundry basket on the back porch containing, among other things, the gun in a sock, a shoebox containing other plastic bags bearing the apple logo and more marijuana. Other New Haven Police detectives testified consistently with Detective DeCarvalho regarding the search and the items found on the back porch. Detective Omaida Nieves also testified that there were five bullets in the magazine of the gun. The jury was shown physical evidence recovered from Lewis's house and photographs depicting some of the evidence as it was found.

Next, a New Haven Police Department forensic examiner, Dr. Jillian Echard, testified that she conducted a DNA analysis of swabs taken by the detectives from the handle and trigger of the gun as well as the interior and exterior of the sock. Dr. Echard testified that the DNA recovered from the gun handle and the sock included DNA from Lewis and three other individuals and that it was "at least 100 billion times more likely" that Lewis, rather than an unknown person, was one of

7

the contributors. App. at 555, 561. She also testified that the "DNA profile" from the trigger included DNA from Lewis and two other individuals.

Finally, the jury learned of Lewis's guilty plea in state court to possessing with intent to distribute the marijuana found on the porch. The jury also heard a recorded phone call made by Lewis while he was incarcerated in which Lewis said, "I'm not sure where they found that gun at or, or where was that gun, or how did they get it. But, I know for a fact I have some marijuana back there in a bag." App. at 458, 749. The parties stipulated this statement referred to the marijuana found during the June 1 search.

The jury returned a verdict of guilty as to Count One. The Government then introduced a stipulation that Lewis "was a convicted felon and knew that he was a convicted felon prior to June 1, 2017," App. at 715, and the jury returned a guilty verdict as to Count Two.

Lewis timely moved the district court for a judgment of acquittal or, alternatively, for a new trial, based on insufficiency of the evidence. The district court denied this motion in a written opinion.

## III. Sentencing

Lewis was sentenced in a two-phase proceeding via videoconference on March 8 and 25, 2021. He was subject to a mandatory minimum sentence of 60 months' imprisonment for possession of a gun in furtherance of a narcotics conspiracy. *See* 18 U.S.C. § 924(c). The Government sought—and the presentencing report recommended—an enhancement for obstruction of justice based on two grounds: first, Lewis's statements to federal investigators in a November 15, 2017 interview, when he asserted the firearm found on the porch belonged to another man and Lewis had only touched it; second, Lewis's statements in an affidavit offered in support of his argument that the search warrant was premised on erroneous information provided by the confidential informant. The district court concluded the enhancement was not justified on the first ground, but was justified based on the second. The affidavit stated: "During the last week of May 2017, I did not occupy nor stay at my place of residence located at 200 Winthrop Avenue, Second Floor . . . . I had no visitors that were present at that location during the last week of May 2017." App. at 104. The district court found that this statement was offered in an intentional effort to discredit the informant and persuade the court to suppress the evidence based on

9

an invalid warrant, which would have led to the dismissal of the charges. Accordingly, the district court determined that a two-level obstruction of justice enhancement was appropriate.

The parties agreed that Lewis's initial base offense level under the sentencing guidelines was 14 and that two levels should be added because the firearm was stolen. Thus, with the addition of the two-level obstruction enhancements, Lewis's final offense level was calculated at 18. Combined with Lewis's Criminal History Category of VI, the resulting guidelines range was 57 to 71 months for the felon in possession charge, in addition to the mandatory minimum of 60 months for the possession in furtherance of drug trafficking conviction. The court stated that adding the guidelines range to the 60-month minimum would result in a sentence of 117 to 131 months, which was "far in excess of what is necessary to address" the conduct and factors at issue. App. at 935. The court sentenced Lewis to 30 months on the felon in possession count for a total sentence of 90 months' imprisonment.

## DISCUSSION

### I.     The Porch Search

Lewis argues that the New Haven Police Department's search and seizure on the porch violated the Fourth Amendment because the warrant authorized a search of only his apartment and the basement. In the alternative, he argues that the district court should have held an evidentiary hearing to determine whether his rights were violated by the search. The Government argues, as the district court concluded, that Lewis lacked "standing" to object to the porch search, which is to say that he failed to show that his Fourth Amendment rights were violated by the search of a common area of his triplex. As explained below, while we do not conclude that the Fourth Amendment always permits warrantless searches of shared areas in multi-unit buildings, we affirm because Lewis failed to carry his burden to show that his Fourth Amendment rights extended to the porch.

"In reviewing the denial of a suppression motion, this Court reviews the district court's factual findings for clear error, and its application of law to fact *de novo*." *United States v. Williams*, 943 F.3d 606, 610 (2d Cir. 2019) (cleaned up). Factual findings include determinations about the "use, privacy, and the physical characteristics of a property." *United States v. McKenzie*, 13 F.4th 223, 231 (2d Cir.

11

2021).  The denial of an evidentiary hearing is reviewed for abuse of discretion. *United States v. Bonventre*, 720 F.3d 126, 128 (2d Cir. 2013).

Because the "rights assured by the Fourth Amendment are personal," courts suppress evidence only "at the instance of one whose own protection was infringed by the search and seizure."  *Rakas v. Illinois*, 439 U.S. 128, 138 (1978) (cleaned up).  Thus, to suppress the evidence found on the porch, the district court needed to find that Lewis's Fourth Amendment rights were infringed by the porch search.  We often refer to this principle as the requirement that a defendant have "standing" to bring a suppression motion.  *See, e.g.*, *Rawlings v. Kentucky*, 448 U.S. 98, 106 (1980); *McKenzie*, 13 F.4th at 230.  A defendant can establish that their Fourth Amendment rights were violated by showing they had a "reasonable expectation of privacy" in the area searched, *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring), or that the Government has "physically intrud[ed] on constitutionally protected areas" to which they have a property entitlement, *Florida v. Jardines*, 569 U.S. 1, 11 (2013).

As the proponent of the motion to suppress, it was Lewis's burden to establish that the search violated his Fourth Amendment rights.  *See Rakas*, 439 U.S. at 130 n.1.  And his entitlement to an evidentiary hearing on his motion likewise

turned on whether he established that there were disputed factual issues going to the validity of the search. *See In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157, 165 (2d Cir. 2008). The Government's response to Lewis's suppression motion made clear that it was disputing that Lewis had a reasonable expectation of privacy over the shared porch. Lewis therefore needed to articulate specific facts regarding the porch and his use of it in order to respond to the Government's argument.

Lewis failed to meet this burden. He neither pointed to any relevant evidence nor made any arguments pertinent to his reasonable expectation of privacy over the porch in his motion papers or during the motion hearing. Although Lewis now argues on appeal that he had a privacy interest because (assertedly) the triplex was owned by his aunt and that all the other residents were his family members, Lewis did not bring this argument to the district court's attention when it was deciding whether he had a protected privacy expectation over the porch. Nor did Lewis offer evidence of the particular uses he made of the porch, point to its proximity to his living area, argue that it was inaccessible to visitors of the triplex, or testify regarding any steps he took to maintain his privacy while using it, as he does on appeal. To the contrary, Lewis conceded during the

13

hearing on the suppression motion that the porch was a shared area of the triplex with a door that "enters into a nonapartment portion of the house." App. at 140.[1]

On this record, we cannot conclude that the district court erred when it concluded that "the back porch was . . . a common area as that phrase is used in the case law," and that, as a result, "Lewis does not have standing to suppress any evidence found in the area." App. at 145. Lewis's failure to adduce before the district court any facts pertinent to his reasonable expectation of privacy over the porch, such as those described above, prevented a conclusion that the challenged search violated his Fourth Amendment rights.

We do not reach this conclusion by applying a categorical rule regarding shared spaces in multi-unit buildings, because we do not understand our precedents to hold that the Fourth Amendment *never* protects a tenant's rights in

---

[1] Although Lewis makes an extended argument on appeal rooted in recent Fourth Amendment precedent concerning curtilage, he did not raise any such argument below. Therefore, we review this argument, if at all, for plain error. *See United States v. Cacace*, 796 F.3d 176, 190 (2d Cir. 2015) (explaining that "under plain error standard, we may act only if there is error, that is clear or obvious, that affects substantial rights, and that seriously affects the fairness, integrity, or public reputation of judicial proceedings"). The district court did not err in failing to *sua sponte* consider a curtilage-based argument on the suppression motion, let alone commit clear or obvious error. As in the expectation of privacy context, a curtilage analysis is fact-specific and often requires the defendant to bring forward facts establishing that his or her curtilage extended to a given area— a record that Lewis failed to develop. *See United States v. Alexander*, 888 F.3d 628, 632 (2d Cir. 2018).

14

such shared spaces. Although Lewis argues on appeal that the district court relied on a categorical rule that the Fourth Amendment allows warrantless searches of shared areas in multi-unit buildings over which a claimant lacks exclusive control, we disagree with his characterization of the district court's ruling. While the district court stated that Lewis's suppression motion failed because he did not have exclusive control over the porch in the multi-unit dwelling, the court also went on to engage in a fact-specific, individualized assessment, noting that the porch was not "locked or closed off" and could "be easily used by other individuals . . . visiting the building." App. at 144–45. Moreover, the Government itself disclaimed any such categorical rule and conceded at oral argument that "there are factual circumstances that can permit" a finding of Fourth Amendment protection in shared areas in multi-unit dwellings. Oral Arg. at 14:35–15:00.

We agree with this concession because an individualized approach is consistent with our precedents. To be sure, we have sometimes used broad language in this context. We first concluded in *United States v. Miguel* that the "lobby of a multi-tenanted apartment house" is not "within the 'curtilage' of each tenant." 340 F.2d 812, 814 (2d Cir. 1965). Subsequent cases also rejected curtilage- and privacy-based suppression arguments regarding arrests and eventually

15

warrantless searches conducted in some shared areas of multi-unit buildings. *See, e.g., United States v. Holland*, 755 F.2d 253, 255 (2d Cir. 1985); *United States v. Fields*, 113 F.3d 313, 322 (2d Cir. 1997); *United States v. Jones*, 893 F.3d 66, 72 (2d Cir. 2018). But in concluding that the defendants lacked a protected interest in the shared spaces at issue, these decisions analyzed to some extent the nature of the space and the defendant's relationship to it. Most recently, in *Jones*, we noted that the car that was searched was parked in a lot shared by tenants of two different buildings, and therefore we concluded that "Jones could not reasonably expect that the driveway should be treated as part of his private home." 893 F.3d at 72; *see also, e.g., Holland*, 755 F.2d at 256 (explaining defendant lacked reasonable expectation of privacy over common hallway because, in part, "there is no indication that he ever tried to" exclude others); *Fields*, 113 F.3d at 322 (reaching same conclusion about activities conducted "in plain view of a bedroom window facing onto the side yard," a common area "where others were free to come and go," after considering factors such as who was entitled to use the space, and whether notice or permission of the other tenants was required). And this fact-specific analysis was warranted because, as detailed below, a categorical rule hinging Fourth Amendment protection solely on exclusive control would be in tension with the

16

Supreme Court's precedent and its articulation of underlying Fourth Amendment principles.

*First*, the Supreme Court has long expressed a preference for case-by-case analysis in the Fourth Amendment context. There is "no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable." *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987) (plurality opinion). The Court has, with limited exceptions, rejected requests to draw bright lines broadly authorizing searches and seizures in particular situations because "the Fourth Amendment will not tolerate adoption of an overly broad categorical approach that would dilute the warrant requirement in a context where significant privacy interests are at stake." *Missouri v. McNeely*, 569 U.S. 141, 158 (2013) (plurality opinion). As the Supreme Court has held in several other contexts, when it comes to shared spaces in multi-unit buildings, we think there is "no valid substitute for careful case-by-case evaluation of reasonableness." *Id.* (citing other Fourth Amendment contexts where the Court has taken this approach).

*Second*, the fact that a particular area or thing is not completely walled off from the outside world has never been wholly determinative of Fourth Amendment protection. This principle is the essential point of *Katz*, which held

17

that "what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." 389 U.S. at 351–52. Moreover, the Court has recognized Fourth Amendment privacy protections in shared spaces for housemates, social guests, and co-workers. *See Georgia v. Randolph*, 547 U.S. 103, 113 (2006) (housemates); *Minnesota v. Olson*, 495 U.S. 91, 96–100 (1990) (guests); *Ortega*, 480 U.S. at 718 (co-workers); *see also Ortega*, 480 U.S. at 730 (Scalia, J., concurring) ("It is privacy that is protected by the Fourth Amendment, not solitude. A man enjoys Fourth Amendment protection in his home, for example, even though . . . his landlord has the right to conduct unannounced inspections at any time."). Together these cases establish that the "untrammeled power to admit and exclude" is not "essential to Fourth Amendment protection." *Olson*, 495 U.S. at 99.

*Third*, in another context, the Court recently rejected a categorical rule that "automatically would grant constitutional rights to those persons with the financial means to afford residences with garages in which to store their vehicles but deprive those persons without such resources of any individualized consideration as to whether the areas in which they store their vehicles qualify as curtilage." *Collins v. Virginia*, 138 S. Ct. 1663, 1675 (2018). That reasoning applies

here. A categorical rule regarding shared spaces would have the effect of extending greater constitutional rights to those with the means to reside in single-family dwellings or those who live outside of densely populated urban areas. *See also United States v. Whitaker*, 820 F.3d 849, 854 (7th Cir. 2016) (noting that "a strict apartment versus single-family house distinction . . . would apportion Fourth Amendment protections on grounds that correlate with income, race, and ethnicity").

A body of non-binding decisions applies these principles and rejects a categorical rule in the context of multi-unit dwellings. Other circuit courts have found Fourth Amendment protections in certain shared areas of multi-tenant properties. *See, e.g., United States v. King*, 227 F.3d 732, 743–50 (6th Cir. 2000) (shared basement of a two-unit building where both units were occupied by members of the same family); *United States v. Fluker*, 543 F.2d 709, 716 (9th Cir. 1976) (small basement-level entry hall shared with one other basement apartment in three-unit building); *Fixel v. Wainwright*, 492 F.2d 480, 483–84 (5th Cir. 1974) (backyard of a four-unit building). Likewise, unpublished opinions of this Court have rejected a categorical rule. *See, e.g., United States v. Bedell*, 311 F. App'x 461, 463 n.2 (2d Cir. 2009) (summary order); *United States v. Sykes*, 304 F. App'x 10, 12

19

n.1 (2d Cir. 2008) (summary order). And district courts within this Circuit routinely conduct fact-based inquiries rather than simply deny a motion to suppress immediately upon finding that it concerns a shared space of a multi-unit property. *See, e.g.*, *United States v. Rico*, No. 18-CR-661 (PGG), 2019 WL 4014826, at *17 (S.D.N.Y. Aug. 26, 2019); *Patrizio v. Nelson*, No. 14-CV-7497 (JBW) (VMS), 2016 WL 3582047, at *7 (E.D.N.Y. June 28, 2016); *United States v. Bartee*, No. 13-CR-365 (RJS), 2013 WL 6164339, at *5 (S.D.N.Y. Nov. 12, 2013).

The Supreme Court has emphasized the importance of giving effect to the "core" of the Fourth Amendment: "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Jardines*, 569 U.S. at 6 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). In light of that principle, we emphasize that a categorical rule that those who live in multi-tenant buildings never have a constitutionally protected privacy interest in the shared areas of their dwellings is inconsistent with the Supreme Court's Fourth Amendment jurisprudence, the approach of our own decisions, and the precedents of our sister circuits. Our decision to affirm the district court's denial of the motion to suppress and an evidentiary hearing rests solely on the facts and circumstances of this case, and on Lewis's failure to meet his burden to put

20

forward specific facts that could establish standing to bring a Fourth Amendment challenge.

## II. Sufficiency of Evidence

We also conclude that the evidence is sufficient to establish that Lewis possessed the handgun recovered on the porch and that he did so "in furtherance" of drug trafficking.

We review the denial of a motion for judgment of acquittal *de novo*. *Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d at 113. "A defendant challenging the sufficiency of the evidence supporting his criminal conviction bears 'a heavy burden.'" *Id.* at 112 (quoting *United States v. Tran*, 519 F.3d 98, 105 (2d Cir. 2008)). This Court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In doing so we defer to "the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (quoting *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017)).

21

Title 18 U.S.C. § 924(c)(1)(A) provides that "any person who, during and in relation to any . . . drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm," commits the crime of possession in furtherance of drug trafficking. Likewise, the law prohibits any person "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce, any firearm." 18 U.S.C. § 922(g).

Lewis challenges the sufficiency of the evidence for his convictions under §§ 924(c)(1)(A) and 922(g)(1) both as to his possession of the firearm (for both convictions) and as to the "in furtherance" of drug trafficking element of his § 924(c)(1)(A) conviction. We conclude that the evidence presented to the jury was more than sufficient to support a guilty verdict on both elements.

## A. Possession

First, we assess whether the evidence was sufficient for the jury to find that Lewis exercised actual possession of the gun. Actual possession requires a showing that the "defendant physically possessed the firearm." *United States v. Gaines*, 295 F.3d 293, 300 (2d Cir. 2002). Lewis's DNA was found on the handle and trigger of the weapon. The Government's forensic examiner, Dr. Echard,

22

testified that Lewis contributed approximately 86% of the DNA profile found on the handle of the gun and that the odds that the DNA found on the gun did not include Lewis's was one hundred billion to one. This testimony plainly allowed the jury to conclude that Lewis possessed the gun, and even brief physical possession satisfies this element. *See id.*

Lewis argues that no reasonable jury could have found possession beyond a reasonable doubt given the possibility that his DNA was found on the gun because of a "secondary transfer," since his DNA was also found on the sock in which the gun was wrapped. But Dr. Echard testified it was very unlikely that the DNA got there solely by secondary transfer, and the Government's proof "need not exclude every possible hypothesis of innocence." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (quoting *United States v. Martinez*, 54 F.3d 1040, 1042– 43 (2d Cir. 1995)). Based on the evidence presented at trial, a jury could have found beyond a reasonable doubt that Lewis possessed the gun.

Lewis maintains that even if the evidence was sufficient to permit the jury to conclude he possessed the firearm, it did not establish that he did so on or about June 1, 2017, as alleged in the indictment. However, the law does not require proof that conduct occurred at the specific moment alleged in the indictment, provided

23

that a defendant is not prejudiced by any variance between the allegations in the indictment and the proof at trial. *See United States v. Teague*, 93 F.3d 81, 84 (2d Cir. 1996) ("[A]n indictment date only needs to be substantially similar to the date established at trial." (cleaned up)). In any event, the fact that Lewis was home when the gun was discovered, had easy access to the porch where the gun was found, and admitted in his state plea to possessing the marijuana the gun was found next to "on or about June 1," App. at 746, means the evidence is plainly sufficient to conclude he possessed the gun at the relevant time.

## B. In Furtherance of Drug Trafficking

We also reject Lewis's sufficiency challenge to the jury's finding that his possession of the gun was in furtherance of drug trafficking. To be sure, "the mere presence of a weapon at the scene of a drug crime, without more, is insufficient to prove that the gun was possessed 'in furtherance of' the drug crime." *United States v. Snow*, 462 F.3d 55, 62 (2d Cir. 2006) (emphasis omitted) (quoting *United States v. Castillo*, 406 F.3d 806, 814 (7th Cir. 2005)). The Government must show a "specific nexus between the charged firearm and the charged drug selling operation" to allow the jury to conclude that the firearm played some part in furthering the crime. *Id.* (internal quotation marks omitted). This is a "fact-intensive" inquiry

24

"well-suited to resolution by a jury," which can consider relevant factors like "the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, . . . whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found." *Id.* at 62–63 & n.6. The ultimate question is whether the firearm "afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking," including protection of the drugs, proceeds, or traffickers. *United States v. Lewter*, 402 F.3d 319, 322 (2d Cir. 2005). Here, Lewis's loaded gun was found with the drugs, which were packaged for distribution and which he admitted in state court to intending to distribute. *See United States v. Willis*, 14 F.4th 170, 184–85 (2d Cir. 2021) (loaded gun found alongside "the combination of drugs and tools of the drug trade" support "in furtherance" finding). Furthermore, the gun and drugs were easily accessible to Lewis. Viewed in the light most favorable to the Government, this evidence is plainly sufficient to find that Lewis possessed the firearm in furtherance of his drug trafficking.

To rebut this conclusion, Lewis relies on a recent summary order, *United States v. Rosario*, 792 F. App'x 76 (2d Cir. 2019) (summary order). But that case is readily distinguishable. There, we vacated a conviction because the evidence

25

established "at most" that the defendant "possessed the gun during the time that he was engaged in a drug-trafficking conspiracy . . . [and] stored it in a locked van parked near his home . . . [and] that the same van had also been parked . . . near the site of" a drug deal the defendant had been observed making a month before. *Id.* at 78–79. The relevant evidence against Lewis is far stronger because, as noted above, his packaged drugs and gun were found *together* at his home. Thus, this case is much more like our precedential decision in *Snow*, which involved two loaded handguns found in a bedroom dresser next to $6,000 in cash in the same room as drug-packaging paraphernalia. *See* 462 F.3d at 63. We held in that case that "a reasonable juror could conclude" that a gun was being used to protect the paraphernalia and proceeds of drug trafficking as well as the drug trafficking defendant based on the "the proximity between the handguns, proceeds, trace amounts of drugs, and drug paraphernalia." *Id.* Here, as in *Snow*, a reasonable juror could have inferred that Lewis's possession of the gun was "in furtherance" of his drug dealing.

### III. Obstruction of Justice Enhancement

Finally, we do not disturb the district court's decision to apply a two-level obstruction of justice enhancement in the guidelines calculation. "On review of a

26

district court's decision to enhance a defendant's sentence for obstruction of justice, we accept the court's findings of facts unless they are clearly erroneous." *United States v. Pena*, 751 F.3d 101, 105 (2d Cir. 2014) (quoting *United States v. Agudelo*, 414 F.3d 345, 348 (2d Cir. 2005)). If the district court's factual findings are "plausible in light of the record viewed in its entirety," then the district court's findings should be affirmed. *United States v. Reilly*, 76 F.3d 1271, 1276 (2d Cir. 1996) (internal quotation marks omitted). We review *de novo* a district court's conclusion that a given set of facts constitutes obstruction of justice, "giving due deference to the district court's application of the guidelines to the facts." *Pena*, 751 F.3d at 105 (quoting *Agudelo*, 414 F.3d at 348).

The Sentencing Guidelines provide for a two-level enhancement for obstruction of justice if "(1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction," and (2) the obstruction was material. U.S.S.G. § 3C1.1. "If the obstruction-of-justice enhancement is based on perjurious testimony, courts must apply the federal criminal perjury statute, 18 U.S.C. § 1621 . . . ." *United States v. Thompson*, 808 F.3d 190, 194 (2d Cir. 2015). Thus, "the sentencing court must find by a preponderance

of the evidence that the defendant 1) willfully 2) and materially 3) committed perjury, which is (a) the intentional (b) giving of false testimony (c) as to a material matter." *Id.* at 195 (internal quotation marks and citation omitted).

The obstruction enhancement should not be applied when a defendant "may have reasonably believed that his statement was true," whether because of a misunderstanding, a lapse in memory, or otherwise. *Pena*, 751 F.3d at 106–07. If a defendant testifies to a detailed account that is demonstrably false, the enhancement has been found to apply. *See, e.g.*, *United States v. Lincecum*, 220 F.3d 77, 79 (2d Cir. 2000) (defendant filed a false affidavit in support of motion to suppress in which he provided "a detailed account of at least three" requests he allegedly made to speak with an attorney at the time of his arrest). On the other hand, if a defendant submits a conclusory affidavit in support of a motion to suppress, the fact that the district court does not find the testimony credible does "not necessarily mean he gave knowingly false testimony in his affidavit." *Agudelo*, 414 F.3d at 349 (reversing application of enhancement where defendant testified via affidavit that "at one point, I told the agents that I wanted to speak to a lawyer but they did not cease their questioning"). Courts must balance the need to disincentivize obstruction of justice through perjury with the risk of subjecting

28

defendants to punishment for submitting an affidavit that raises a colorable suppression issue on which they do not ultimately prevail. *See Pena*, 751 F.3d at 106 n.1 (noting that the obstruction enhancement "is not intended to punish a defendant for the exercise of a constitutional right," and "not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice" (quoting U.S.S.G. § 3C1.1 cmt. (n.2))).

While the circumstances in this case "walk a line between *Agudelo* and *Lincecum*," *Pena*, 751 F.3d at 106, they fall on the *Lincecum* side of the line, and therefore the district court's finding that the enhancement applied here was proper. Lewis stated, "[d]uring the last week of May 2017, I did not occupy nor stay at my place of residence located at 200 Winthrop Avenue, Second Floor . . . . I had no visitors that were present at that location during the last week of May 2017." App. at 104. During the suppression hearing that followed, Lewis's attorney reaffirmed this statement, asserting that while Lewis returned to his apartment to change clothes and spend time out front, he "was not present with any visitors" at the time the informant stated they were there. App. at 120–21. Lewis was present at the hearing and did not dispute these statements.

On appeal, Lewis argues that he did not categorically assert that he was *never* present *in* his residence and that the evidence does not conclusively show that he slept there or entertained visitors inside the apartment. He argues that it is therefore "attributable to a lapse in memory or to counsel's inartful drafting" or "simply, to a miscommunication." Appellant's Br. 64–65.

Applying the deferential standard under which we review the district court's factual findings, we affirm. The district court found that Lewis's affidavit was categorical enough to admit of only one meaning and constituted a willful attempt to deceive the court as to a material issue—whether the informant had been inside of Lewis's apartment and basement when the informant said he had. The court concluded that Lewis could not have subjectively believed he was telling the truth.

We agree that the only possible relevance of the statement was to suggest that Lewis had no visitors at his apartment. Likewise, we cannot find clear error in the district court's conclusion that Lewis willfully lied and that the affidavit was demonstrably false. Significant evidence indicated that Lewis slept or entertained visitors inside his home during the week in question. For example, Lewis was at home with his girlfriend and her daughter when the search warrant was executed

on June 1st, and the apartment appeared lived-in. Furthermore, a detective testified at the suppression hearing that he had seen Lewis sitting on his front porch a few days before the search and that Lewis never mentioned not having stayed at the apartment in his post-arrest interview. The record also includes text messages sent from Lewis's phone after 10:00 p.m. on May 27th stating, "I'm at my crib," and "[w]e in front of my crib trying to get the cookout rite," to which someone responded, "Oh ill be thrue." App. at 110. Finally, GPS data associated with pictures and videos on Lewis's phone show that he was frequently near his house during the week in question, and a video taken on Lewis's phone during the last week of May 2017 showed the surroundings outside Lewis's home on 200 Winthrop Avenue.

On this record, we are not "left with the definite and firm conviction" that the district court erred in concluding that Lewis's statements were demonstrably false by a preponderance of the evidence. *United States v. Cuevas*, 496 F.3d 256, 267 (2d Cir. 2007) (internal quotation marks omitted). Application of the obstruction enhancement was therefore appropriate.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

31